Roberto ROBLES, by his g. a. l., Pablo Robles, Appellant,

v.

Marion B. FOLSOM, Federal Security Administrator, Appellee.

No. 17, Docket 23434.

United States Court of Appeals Second Circuit.

Argued Oct. 8, 1956.

Decided Dec. 10, 1956.

Clark, Chief Judge, dissented.

Gordon Lloyd Potter, New York City, for appellant.

Elliott Kahaner, Brooklyn, N. Y., Leonard P. Moore, U. S. Atty., Brooklyn, N. Y., for appellee.

Before CLARK, Chief Judge, and HAND and SWAN, Circuit Judges.

HAND, Circuit Judge.

This is an appeal from a judgment, summarily dismissing a complaint to reverse the decision of the Federal Social Security Administration, denying the plaintiff's application for "insurance benefits" after the death of his father. The question is whether the plaintiff falls within section 402(d) (3) of Title 42 U.S.C.A., which reads as follows: "A child shall be deemed dependent upon his father * * * unless * * * such individual was not living with or contrib-

uting to the support of such child and— (A) such child is neither the legitimate nor adopted child of such individual." Section 416(h) (1) of the act provides that: "In determining whether an applicant is the wife, husband, widow, widower, child or parent of a fully insured or currently insured individual * * * the Administrator shall apply such law as would be applied in determining the devolution of intestate personal property by the courts of the State in which such insured individual * * * was domiciled at the time of his death." At the time when the plaintiff's father died he was domiciled in the state of New York, and the plaintiff was living with him and was therefore "dependent" upon him within the meaning of § 402(d) (3). He had been born in Puerto Rico while his father had been domiciled there, and, although his father and mother had never been married, his father had supported him from his birth, and had taken him to the United States where he was living with the family. The Administrator's "referee" who decided the case found that in "the child's birth certificate the wage earner was named as the child's father; the wage earner was the informant who provided such information. The wage earner recognized and accepted the child as his own from his birth"; and, as we have said, had supported him "at least from the time that" he "came to the United States in 1944." The only question therefore is whether the plaintiff was what the statute means by a "child," and that depends upon § 416(h) (1): that is, whether the courts of New York would have accorded him "the same status relative to taking intestate personal property" that they would have accorded to a child: or, in other words, whether under the law of New York the plaintiff would have inherited the personal property of his father, had his father died intestate.

In Miller v. Miller, 91 N.Y. 315, the Court of Appeals of New York held that, if an illegitimate child be legitimated by the subsequent marriage of his parents in the state where they were then domiciled,

his status as legitimate follows him to an after-acquired domicile, and he inherits his father's real property as though born in wedlock. However, although nothing but subsequent marriage will legitimate a child born out of wedlock in Puerto Rico,[1] it is true that the Puerto Rican code allows an illegitimate child to inherit his proportion of his father's property, if his father has "recognized" him as his own—§ 504; and, as we have said, the plaintiff was so "recognized," and would have inherited his father's personal property, had his father been domiciled in Puerto Rico when he died—§ 506(3). Thus the issue is narrowed to whether the plaintiff would have inherited his share of his father's personal property when his father died a resident of New York, because, although not legitimate, he would have done so, if his father had been domiciled in Puerto Rico. That he would have inherited his mother's personal property in New York is true, Decedent Estate Law, McK.Consol.Laws, c. 13, § 83(13); but that right is confined to the mother's property.

The question whether "legitimacy" is a condition upon the inheritance of the father's personal property in New York regardless of any right of inheritance elsewhere, has come up only three times in the New York courts, so far as we can find, and always in a Surrogate's Court; and the first question is whether we should take these decisions as authoritative, or whether we should interpret the New York law independently, as we can best understand it. We think that we are to take the decisions as authoritative, and not as the Supreme Court regarded a decision of the Court of Common Pleas of South Carolina in King v. Order of United Commercial Travelers, 333 U.S. 153, 68 S.Ct. 488, 92 L.Ed. 608. Although we can find no decision precisely in point, it appears to us that the differences in substance between the Surrogate's Court and the old Court of Chancery in New Jersey are not enough to make inapplicable the decision of the Supreme Court in

Fidelity Union Trust Co. v. Field, 311 U.S. 169, 61 S.Ct. 176, 85 L.Ed. 109. Besides, in the case at bar there are three similar, but independent, interpretations of the same issue, without any intimation of dissidence in the opinions of the higher courts.

The three decisions we refer to are In re Vincent's Estate, Kings County, 1947, 189 Misc. 489, 71 N.Y.S.2d 165; In re Tomacelli-Filomarino's Estate, New York County, 1947, 189 Misc. 410, 73 N.Y.S.2d 297; and In re Slater's Estate, New York County, 1949, 195 Misc. 713, 90 N.Y.S.2d 546. In the first, Surrogate McGarey had before him the question whether an illegitimate child, born in Haiti, inherited by descent from her father who was domiciled in New York at the time of his death, though he remained a citizen of Haiti. The court held 189 Misc. at page 493, 71 N.Y.S.2d at page 169 that if the law of Haiti "merely enables a natural child, when recognized by its parents or parent, to inherit as a recognized natural child as distinguished from one which legitimates such child, it is one merely of descent which governs solely the inheritance of property located in that State." New York courts "will not recognize a law or statute of a * * * state which merely permits an illegitimate child to inherit as an illegitimate in the estate of its father." In the second case [189 Misc. 410, 73 N.Y.S.2d 299] Surrogate Collins held that the illegitimate child of a Mexican, domiciled in that republic, did not inherit property in New York because her parents had never married, the only method of legitimation known to the Mexican law. Both her parents had indeed "recognized" her and the Mexican law gave her certain rights of support and inheritance, but this did not give her any "interest whatever in the estate administered here."

In the third decision the father of an illegitimate child, born in Louisiana and there domiciled when the child was born, had died after acquiring a domicile in New York. The law of Louisiana pro-

1. Civil Code of Puerto Rico, § 482, 31 L.P.R.A.

vided for the legitimation of a child by subsequent marriage, Art. 199 of the LSA–Civil Code, or by a declaration by both parents of intention "to legitimate such child," Art. 200, though the declaration must be "by an act passed before a notary and two witnesses." Illegitimates might also be "acknowledged by their father" and then "are called natural children" Art. 202, and this "acknowledgement of an illegitimate child shall be made by a declaration executed before a notary public, in the presence of two witnesses" Art. 203. Surrogate Frankenthaler decided that [195 Misc. 713, 90 N.Y.S.2d 547] "the Louisiana courts have held, in a long series of decisions, that this statutory device"—a "declaration * * * before a notary"—"is not the exclusive method of acknowledgment and that a child * * * may prove that his parents recognized his legitimate status by other competent evidence." He then described the evidence that satisfied him that upon "the law and the facts" the child was "legitimate under Louisiana law." Throughout he assumed that In re Vincent, supra, was correctly decided because in the case at bar "the Louisiana law, unlike that of Haiti * * * provides for legitimation" (underscored) "by acts other than subsequent intermarriage." We accept the Surrogate's understanding of the Louisiana decisions, though we have not considered them because the issue is irrelevant here. The only important factor is that he proceeded upon the premise that it was necessary to decide, not that the child was entitled to inherit in Louisiana, but that she had been "legitimated" by what her father had done while he was domiciled there. The plaintiff's difficulty is that there is no evidence, as we have said, either in the Code or the decisions that anything other than subsequent marriage of parents will legitimate a child in Puerto Rico, as distinct from giving him rights of inheritance.

As for Gonzalez v. Hobby, D.C., 110 F.Supp. 893, 897, it is enough to distinguish it from the case at bar that the judge held that the plaintiffs' right to the insurance of their father was not to be determined by "the substantive law of the District of Columbia," but by "the substantive law of the place where he" [the father] "resided or was domiciled." The father was domiciled in Puerto Rico when he died, by the law of which, as has appeared, a child may inherit regardless of his "legitimacy"; and it would indeed have been a very harsh ruling to say that the plaintiffs in that case should not be awarded the insurance granted by the statute, although they were entitled to all the rest of their father's personal property. On the other hand, if the plaintiff at bar were successful here, the insurance money is the only personal property that devolved upon him from his father. Whatever we may feel about the persistence of the cruel archaism of illegitimacy, it appears to us that Congress plainly meant these rights to descend as if they were parts of the personal property of the insured, and that we should have no warrant for interpolating an exception, however much we might welcome the result.

Order affirmed.

CLARK, Chief Judge (dissenting).

As Judge HAND's opinion points out, this child from birth was accepted by the father as his own and a part of his family; and while the parents were eligible to marry, they just did not bother to do so. No bar to either inheritance or receipt of social security benefits could have arisen had father and son remained in Puerto Rico; but removal to New York now results in denying these benefits to the recognized child. This very harsh result comes, in my opinion, from forcing Anglo-Saxon moral patterns on a family having its origin in the more tolerant atmosphere of Puerto Rico and the civil law it follows.[1] And this, in

1. "The common law of England, which is also the American common law, is more unfavorable to the illegitimate child than the civil law of Rome, on which the continental legal systems are based, mainly in two respects: It does not recognize a legal relationship even between the mother and the child and it does not allow

turn, comes about from an emphasis on names or labels, rather than on substance, in translating civil law concepts into New York equivalents.

Whereas New York classes all children born out of wedlock as "illegitimates," legal systems influenced by the Code Napoleon distinguish "natural children" from others—a natural child being one whose parents were not legally barred from marrying each other at the time of the child's birth or conception.[2] By informal voluntary acts a parent can raise a natural child to the status of "recognized (or acknowledged) natural child," thus giving it rights of inheritance and certain social benefits. Or, by formal acts prescribed in the local civil code, the parent can "legitimate" the child, elevating it above recognized natural children to the level of those born in wedlock. In these civil law countries there are three categories of children—"legitimates," "acknowledged natural children," and others, i. e., bastards; and there are two different processes for changing status—"legitimation" and "acknowledgment."[3]

I cannot agree that the New York law prevents an acknowledged natural child from taking personal property if his father dies intestate while domiciled in New York. It is clear that the status of the child would be determined by the law of the place where he was born. Miller v. Miller, 91 N.Y. 315. In that case a child born out of wedlock in Wurttemberg attempted to take real property in New York by intestacy upon the death of his father. His parents had subsequently married each other, and the law of Wurttemberg entitled him to inherit real property there. Under the then law of New York, however, subsequent marriage did not "legitimate" children born out of wedlock and they could not inherit. The Court of Appeals applied the Wurttemberg law of inheritance and found for the child.[4]

In the most recent New York case discussed by my brethren a child born out of wedlock in Louisiana whose parents never married was considered eligible to inherit in New York. In re Slater's Estate, 195 Misc. 713, 90 N.Y.S.2d 546. Louisiana's Civil Code derived from the Code Napoleon and had the concept of acknowledged natural child. Under the Louisiana cases, which were cited in the New York opinion, the father's informal acts of attending his daughter's christening and later referring to her as his own were sufficient to confer this status on the child, despite the literal wording of Art. 203 of the LSA–Civil Code. Lange v. Richoux, 6 La. 560; Succession of Vance, 110 La. 760, 34 So. 767; Succession of Serres, 136 La. 531, 67 So. 356; Taylor v. Allen, 151 La. 82, 91 So. 635; Succession of Hébert, 33 La.Ann. 1099. Under other Louisiana cases, which were also cited in the New York opinion, such informal acts of the father were insufficient to "legitimate" the child and elevate it to full legal equality with children born in wedlock. Hart v. Hoss, 26

---

legitimation by subsequent marriage." Freund, Illegitimacy Laws of the United States and Certain Foreign Countries 9 (1919).

2. Robbins & Deák, The Familial Property Rights of Illegitimate Children: A Comparative Study, 30 Col.L.Rev. 308, 321–325 (1930); Note, 15 La.L.Rev. 221 (1954).

3. "The relation less than legitimation, that of recognized natural child, may arise by the law of several European states, between a parent and a natural child." 2 Beale, A Treatise on the Conflict of Laws § 140.2 (1935).
For a translation of the civil codes of

France and Switzerland dealing with this subject see Freund, op. cit. supra note 1, at 245–248, 254–256. For a translation of the modern Spanish law on the subject see Fisher, The Civil Code of Spain 56–70 (5th Ed. 1947). See also Laws of Puerto Rico Ann. tit. 31, §§ 442–507 (1954), and the Translation of the Civil Code in Force in Cuba, Porto Rico, and the Philippines, published by the Government Printing Office in 1899, at 22–27.

4. The quotation from the Wurttemberg statute in the Court of Appeals opinion clearly indicates that the statute governs the inheritance of real property in Wurttemberg. 91 N.Y. 315, 317.

La.Ann. 90; Perkins v. Brownell-Drews Lumber Co., 147 La. 337, 84 So. 894; Duvigneaud v. Loquet, 131 La. 568, 59 So. 992; Stewart v. Parish of Jefferson Davis, 17 La.App. 626, 136 So. 659.

These cases held that both acknowledged and legitimated children had rights of intestate succession, and the distinction between the two groups was significant only if the child's claim was contested by an heir with rights superior to an acknowledged child, but not superior to a legitimated one. The New York Surrogate in In re Slater's Estate, supra, 195 Misc. 713, 90 N.Y.S.2d 546, properly did not distinguish between acknowledged and legitimated children, but rather classed both types together and contrasted them with children born out of wedlock and never elevated—a group which has no rights of inheritance or social position. Where he spoke of acknowledged children as "legitimate" or "legitimated," he used these words in their New York, and not their Louisiana, sense.[5]

From the cases he cited it is clear the Surrogate understood that Louisiana courts would have called the Slater child "acknowledged," and not "legitimated." All commentators who have discussed the Louisiana cases have noticed that such informal acts create the first status, rather than the second.[6] My brethren say these cases are irrelevant, and they prefer to interpret the Surrogate's opinion in the light of four Louisiana statutes. But the cases which the Surrogate selected to support his decision seem a far better indication of his meaning than the naked text of these statutes—two of which he did not cite, and all of which are discussed in these cases.

Thus the result reached by the Surrogate appears to be good sense, as well as good law. Since civil law jurisdictions have three categories of children and New York has only two, the "acknowledged natural child" must be likened to either New York "legitimates" or New York "bastards." The chief similarity to the New York bastard, for purposes of intestate succession, is a mere semantic identity—neither is labeled "legitimate." On the other hand, the acknowledged child is one whom the father claimed as his own with knowledge that the act would confer on it rights of inheritance and greater social status.

My brethren rely on an earlier opinion of another Surrogate which takes their position; but it is unpersuasive authority, since it marches from a premise previously rejected by the New York Court of Appeals. In re Vincent's Estate, 189 Misc. 489, 71 N.Y.S.2d 165. There a Surrogate refused to consult the foreign law of *inheritance* in determining whether acknowledged children were to be analogized to New York "legitimates"; instead he looked to the foreign law of *legitimacy*. 189 Misc. 489, 71 N.Y.S.2d 165, 169. In this initial step he became involved in semantics which led necessarily to the conclusion that persons whom foreigners call "legitimate" are the only ones New Yorkers can treat as "legitimate" for purposes of inheritance. As pointed out above, the Court of Appeals proceeded more logically in the Miller case, 91 N.Y. 315, and looked to the foreign law of *inheritance* in such circumstances. Whether the author of the Slater opinion, 195 Misc. 713, 90 N.Y.S.2d 546, was convincing or not in his effort to distinguish the Vincent case, 189 Misc. 489, 71 N.Y.S.2d 165, he certainly had it before him and rejected its result.[7]

---

5. See note 10 infra, where a commentator similarly used the word "legitimated" in its Anglo-Saxon sense to cover children "acknowledged" through Louisiana procedures.

6. E. g., Professor Leonard Oppenheim's comprehensive article, Acknowledgment and Legitimation in Louisiana—Louisiana Act 50 of 1944, 19 Tulane L.Rev. 325

(1945), and the works cited by him; Freund, op. cit. supra note 1, at 24; Stevenson, Analysis and Tabular Summary of State Laws Relating to Illegitimacy in the United States 16–19 (1929); U. S. Dept. of Labor, Children's Bureau, Chart No. 16, "Paternity Laws," 2 (1938); Note, 15 La.L.Rev. 221 (1954).

7. The other case cited by my brethren, In re Tomacelli-Filomarino, 189 Misc.

Faced as we are with a conflict of New York cases we should follow the most recent state decision, especially since the contrary authority contradicts a lengthy, well-reasoned, unanimous opinion of the highest state court. The growing tendency of the New York courts to look with more sympathy on the claims of illegitimates leads to the same result. See In re Anonymous' Estate, 204 Misc. 1045, 126 N.Y.S.2d 749. Considerations of policy and humanity point the same way. In such circumstances we should not be more harsh than the courts of the state whose law we are charged to apply. See Bloch v. Ewing, D.C.S.D.Cal., 105 F.Supp. 25.

Since, as I believe, acknowledged natural children may take by inheritance in New York, the plaintiff should prevail. The Puerto Rican Civil Code, which derives from the Louisiana and Spanish Civil Codes,[8] has the same three categories of legitimates, recognized natural children, and others.[9] Like the Louisiana law cited in the Slater case, 195 Misc. 713, 90 N.Y.S.2d 546, Puerto Rican law distinguishes between natural children who have been "recognized" and those who have been "legitimated." The former have limited rights of inheritance and social status; the latter are raised to full equality with children born in wedlock.[10] It is true that the Puerto Rican procedures for raising natural children to full legitimacy are somewhat different from the procedures in Louisiana;[11] but the difference cannot distinguish the Slater case from this one, since in both cases the child was only "acknowledged" under local law, and in neither case did the parents utilize the local procedure for elevating their child to full equality with children born in wedlock.

I think we should reverse and direct judgment for the plaintiff.

---

410, 73 N.Y.S.2d 297, does not contain a sufficient statement of the Mexican law to indicate whether or not the child involved was in the same position as the plaintiff; in any event the decision relies wholly on the Vincent case, 189 Misc. 489, 71 N.Y.S.2d 165, and adds nothing to it.

8. See the historical notes to Laws of Puerto Rico Ann. tit. 31, §§ 442–507, especially § 442 (1954).

9. Sec. 442 is the same as §§ 178–180 of the La. Civil Code of 1870, and defines legitimate and illegitimate children. Secs. 461–466 further define legitimate children and state their rights. Secs. 481–486 govern the process of "legitimation." Secs. 501–506 define natural children, prescribe the modes for recognizing them, and state the rights of recognized natural children. Secs. 507–514 govern the right of other children to support.

10. See U. S. Dept. of Labor, op. cit. supra note 6, at 2: "The law of Louisiana differs from that of other States in being based on the Napoleonic Code. Only the child of persons who might legally have married at the time of the child's conception, may be legitimated on marriage of his parents. Such children, called natural children, are the only children born out of wedlock whose interests are pro-

tected by the Louisiana law. In addition to legitimation on formal acknowledgment of paternity and marriage of the parents, such a child may be 'legitimated' for purposes of inheritance by either the natural mother or father on declaration of intentions before a notary public or two witnesses. The law of Puerto Rico is similar in origin and similarly defines a natural child."

11. In Puerto Rico at the time when the plaintiff was born, full legal equality for children born out of wedlock was possible only if the parents subsequently married. Laws of Puerto Rico Ann. tit. 31, § 482 (1954). In Louisiana at the time of the Slater child's birth such equality was conferred only if there were formal acts, either before a notary or in the marriage contract. E. g., Perkins v. Brownell-Drews Lumber Co., 147 La. 337, 84 So. 894; Duvigneaud v. Loquet, 131 La. 568, 59 So. 992; Succession of Serres, 136 La. 531, 67 So. 356. In both jurisdictions later legislation has made it much easier for children born out of wedlock to attain full equality. See Oppenheim, Acknowledgment and Legitimation in Louisiana—Louisiana Act 50 of 1944, 19 Tulane L.Rev. 325 (1945); Laws of Puerto Rico Ann. tit. 31, § 441 (1954), passed in 1952.