# United States Court of Appeals
## For the First Circuit

No. 12-2413

LISANDRO PATRICK,

Petitioner, Appellant,

v.

NOELIA RIVERA-LOPEZ,

Respondent, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Dominguez, U.S. District Judge]
[Hon. Camille L. Velez-Rive, U.S. Magistrate Judge]

Before

Howard, Circuit Judge,
Souter,* Associate Justice,
and Stahl, Circuit Judge.

Stephen J. Cullen, with whom Kelly A. Powers and Miles &
Stockbridge P.C. were on brief, for appellant.
Maricarmen Carrillo-Justiano, with whom Janice Gutierrez-
Lacourt and Servicios Legales de Puerto Rico, Inc. were on brief,
for appellee.

February 1, 2013

*Hon. David H. Souter, Associate Justice (Ret.) of the Supreme
Court of the United States, sitting by designation.

**HOWARD**, **Circuit Judge**.  Lisandro Patrick appeals a decision of the United States District Court for the District of Puerto Rico dismissing his petition for the return of his child under the Hague Convention on the Civil Aspects of Child Abduction. He also appeals the district court's order that he post a bond to proceed with the case.  We reverse the district court's dismissal of his petition and vacate the order imposing a bond.

## I. Background

This appeal follows the district court's grant of a motion to dismiss.  As we explain below, the motion to dismiss is more properly treated as a motion for judgment on the pleadings. When deciding an appeal of a motion for judgment on the pleadings, "[w]e view the facts contained in the pleadings in the light most flattering to the nonmovants . . . and draw all reasonable inferences therefrom in their favor."  Aponte-Torres v. Univ. of P.R., 445 F.3d 50, 54 (1st Cir. 2006).

### A. Abduction of Patrick's Daughter

Appellant Lisandro Patrick and Appellee Noelia Rivera-Lopez are the biological parents of L.N.R., a girl born in Puerto Rico in 2009.  For purposes of this appeal, it is uncontested that before L.N.R.'s birth, Patrick signed an affidavit acknowledging paternity.  Nevertheless, L.N.R.'s birth certificate does not list a father.  Patrick and Rivera were unmarried when L.N.R. was born, but they married in Puerto Rico in June 2010.

Patrick and Rivera agreed that after the marriage, Patrick would move to the United Kingdom and that Rivera would follow with her children (L.N.R. and a child from another father) as soon as Patrick could set up the family home and earn enough money to pay for the family's travel. In January 2011, Rivera and her children moved to the United Kingdom, where they stayed with Patrick. L.N.R. made friends and attended various play groups there, and the family received medical care from England's National Health Service, as well as other public benefits. Patrick and Rivera applied for a Residence Card for L.N.R. in June 2011.

In March 2012, Rivera absconded to Puerto Rico with her children. When Patrick discovered that Rivera had taken her children to Puerto Rico and did not intend to return to the United Kingdom, he filed a petition for the return of L.N.R. in the United States District Court for the District of Puerto Rico under the Hague Convention on the Civil Aspects of International Child Abduction, opened for signature Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89 ("Hague Convention" or "Convention"), as well as its implementing statute, the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601-11610.[1] The petition alleged that Rivera wrongfully removed L.N.R. from her habitual residence, the United Kingdom.

---

[1] Patrick did not petition for the return of Rivera's other child because he is not the child's biological father.

-3-

## B. District Court Proceedings

On the day that he filed his petition, Patrick asked the district court to expedite his case and issue an order to show cause to ensure that Rivera would appear in court with L.N.R. The next business day, the case was assigned to a judge, who immediately issued an order to show cause requiring Rivera to appear with L.N.R. at a hearing four days later. The order, however, also required Patrick to post a $10,000 surety bond. Patrick moved to vacate the bond requirement, in part on the grounds that Article 22 of the Hague Convention prohibits a court from requiring a bond "to guarantee the payment of costs and expenses." Patrick pointed out that he was currently unemployed and receiving pro bono legal assistance. In the alternative, he asked the court to reduce the bond to $500. That same day, the district court issued a minute order in which it refused to vacate the bond requirement but reduced the bond to $500. At the show cause hearing the next day, the court appointed counsel for Rivera, ordered her to remain in Puerto Rico with L.N.R., and set an evidentiary hearing.

After a series of scheduling difficulties, the parties consented to proceed before a magistrate judge. In consultation with the parties, the magistrate judge scheduled a non-jury trial for October 12, 2012. Rivera answered Patrick's petition, admitting that he is L.N.R.'s father.

-4-

On the eve of trial, October 11, Rivera moved to dismiss Patrick's petition under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted. Rivera argued in part that removal of a child is "wrongful" under the Hague Convention only if "it is in breach of [a person's] rights of custody," Hague Convention art. 3, and that Patrick had no rights of custody under the Convention because he was not registered as L.N.R.'s father in her birth certificate. The magistrate judge granted Rivera's motion to dismiss on the ground that Patrick never presented his affidavit of paternity to Puerto Rico's Vital Statistics Registry. Patrick v. Rivera-Lopez, Civil No. 12-1501 (CVR), 2012 WL 5462677 (D.P.R. Nov. 8, 2012). Patrick timely appealed the dismissal of his petition, as well as the bond requirement.

## II. Analysis

### A. Dismissal Under Federal Rule of Civil Procedure 12(b)(6)

Patrick's first complaint about the dismissal of his petition is procedural: Rivera filed her motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) long after the deadline for responsive pleadings, and after she had filed her answer. Patrick is correct that this motion was untimely because "[a] motion asserting [a defense listed in Rule 12(b)] must be made before pleading if a responsive pleading is allowed." Fed. R. Civ. P. 12(b). Instead of deciding the motion under Rule 12(b)(6), the

-5-

district court should have treated it as a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c). Aponte-Torres, 445 F.3d at 54.

The court's reliance on the wrong rule, however, was inconsequential. Converting the grounds for a motion from Rule 12(b)(6) to Rule 12(c) "does not affect our analysis inasmuch as the two motions are ordinarily accorded much the same treatment." Id. "Rule 12(c) does not allow for any resolution of contested facts; rather, a court may enter judgment on the pleadings only if the uncontested and properly considered facts conclusively establish the movant's entitlement to a favorable judgment." Id. Nothing about the district court's judgment suggests that the result would have been different if the court had converted the motion. We will treat Rivera's motion to dismiss as a motion for judgment on the pleadings, and we will review the district court's decision de novo. Id. at 55.

**B. Patrick's Entitlement to Relief Under the Hague Convention**

1. The Hague Convention and United Kingdom Law

"The [Hague] Convention was adopted in 1980 in response to the problem of international child abductions during domestic disputes. The Convention seeks 'to secure the prompt return of children wrongfully removed to or retained in any Contracting State,' and 'to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the

other Contracting States.'" <u>Abbott</u> v. <u>Abbott</u>, 130 S. Ct. 1983, 1989 (2010) (quoting Hague Convention art. 1).

The Convention provides that removal of a child is wrongful when

> [(a)] it is <u>in breach of rights of custody</u> attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> [(b)] at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention art. 3 (emphasis added). "Rights of custody" include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." <u>Id.</u> art. 5. "Where a child has been wrongfully removed or retained in terms of Article 3 . . . the authority concerned shall order the return of the child forthwith." <u>Id.</u> art. 12.

The United States has implemented the Convention through ICARA, which authorizes a person who seeks a child's return to file a petition in state or federal court. 42 U.S.C. § 11603(a)-(b). The court "shall decide the case in accordance with the Convention." <u>Id.</u> § 11603(d). If the child has been "wrongfully removed or retained within the meaning of the Convention," the child shall be "promptly returned," subject to certain exceptions. <u>Id.</u> § 11601(a)(4).

-7-

Given this framework, Patrick must allege facts sufficient to show that he has "rights of custody . . . under the law of the State in which the child was habitually resident immediately before the removal or retention." Hague Convention art. 3. Patrick alleged in his petition that L.N.R.'s habitual residence is the United Kingdom. For purposes of this appeal, Rivera does not dispute this allegation. Therefore, Patrick's rights of custody are determined with respect to United Kingdom law.

To evaluate Patrick's rights of custody under United Kingdom law, we must follow a trail of statutes. Our starting point is the law's description of "parental responsibility," which Patrick and Rivera agree is tantamount to "rights of custody": "Where a child's father and mother were married to each other at the time of his birth, they shall each have parental responsibility for the child." Children Act, (1989) § 2(1).[2] On its face, this provision would appear not to apply to Patrick and Rivera, who married after L.N.R.'s birth, but "[r]eferences in this Act to a child whose father and mother were . . . married to each other at the time of his birth must be read with section 1 of the Family Law Reform Act 1987 (which extends their meaning)." Id. § 2(3). That section states that "references to a person whose father and mother

_____

[2] The National Archives of the United Kingdom has made these statutes available at http://www.legislation.gov.uk/.

-8-

were married to each other at the time of his birth include . . . references to any person to whom subsection (3) below applies." Family Law Reform Act, (1987) § 1(2). Subsection (3) applies to "any person who . . . is a legitimated person within the meaning of section 10 of [the Legitimacy Act 1976]." Id. § 1(3). That section defines "legitimated person" to include "a person legitimated or recognised as legitimated . . . under section 2 or 3 above," Legitimacy Act, (1976) § 10(1), and Section 3 of the Legitimacy Act 1976 provides that

> where the parents of an illegitimate person marry one another and the father of the illegitimate person is not at the time of the marriage domiciled in England and Wales but is domiciled in <u>a country by the law of which the illegitimate person became legitimated by virtue of such subsequent marriage</u>, that person, if living, shall in England and Wales be recognised as having been so legitimated from the date of the marriage.

Id. § 3 (emphasis added). Based on these statutes, we conclude (as did the district court) that L.N.R.'s removal was wrongful under the Hague Convention if L.N.R. became legitimated under Puerto Rico law by virtue of Patrick's marriage to Rivera.[3]

---

[3] United Kingdom law provides other means for a father to obtain parental responsibility, but Patrick does not allege that he has complied with them.

With his petition, Patrick filed a letter from the International Child Abduction and Contact Unit (a unit of Ministry of Justice's Official Solicitor) stating that "[t]he parents are married to each other and therefore both have parental responsibility for [L.N.R.], pursuant to Section 2(1) of the Children Act 1989." It is unclear whether this conclusion followed

## 2. Legitimation under Puerto Rico Law

For more than a century, Puerto Rico law has provided that a child born under the same circumstances as L.N.R. is legitimated by the subsequent marriage of her parents. When Spain ceded Puerto Rico to the United States in 1898, the Spanish Civil Code provided that "natural children," defined as children born out of wedlock to parents who could have married each other at the time of conception, may be legitimated by the subsequent marriage of their parents. Ex Parte Hernández Martínez, 65 P.R.R. 132, 137 (1945). Puerto Rico's Civil Codes of 1902 and 1911 contained similar laws. Id. at 138, 140-41. Puerto Rico's current law is the same, except that it no longer requires that a child's parents be eligible to marry each other at the time of the child's conception:

> The legitimation of children had out of wedlock shall be accomplished by the subsequent reciprocal marriage of the parents; Provided, That there shall be considered as legitimated children, all children had out of wedlock prior to the approval of this Act, whose parents have married each other after the birth of said children.

P.R. Laws Ann. tit. 31, § 482; see also id. § 501 ("All children born out of wedlock subsequent to [August 10, 1942], shall be natural children, whether or not the parents could have married at

---

from the series of statutes above, or if it was based on an incorrect assumption that Patrick and Rivera were married when L.N.R. was born.

the moment when such children were conceived. These children will be legitimized by the subsequent marriage of the parents, to each other.").

Despite this clear language, the district court held that Patrick's marriage to Rivera did not legitimate L.N.R. under Puerto Rico law because Patrick did not present his affidavit of paternity to the Vital Statistics Registry of Puerto Rico. The court stated that a child born out of wedlock "will not be automatically considered as begotten by" a man and woman who later marry, unless they register the child as theirs. Patrick, 2012 WL 5462677, at *6 (citing Ramos v. Rosario, 67 P.R.R. 641 (1947)). The court relied on León Rosario v. Torres, 9 P.R. Offic. Trans. 1082 (1980), for the proposition that "Puerto Rico's legislative system allows no room for liberal interpretation regarding facts of life recorded in [the] Vital Statistics Registry of Puerto Rico and exceptions [to the Vital Statistics Registry Act of Puerto Rico] shall be construed restrictively." Patrick, 2012 WL 5462677, at *6.

Neither opinion on which the district court relied adequately supports its decision. In Ramos, the Supreme Court of Puerto Rico decided that a man could represent his minor son in court based on an affidavit of paternity that he filed with the Vital Statistics Registry. 67 P.R.R. at 644-45. But the Court did not hold that filing the affidavit with the Vital Statistics Registry, as opposed to the mere existence of the affidavit,

-11-

entitled the father to represent his son, and the opinion says nothing about whether filing the affidavit legitimated the son. In León Rosario, when the Court stated that the Vital Statistics Registry Act must be construed narrowly, it was simply rejecting a claim that the Vital Statistics Registry was required to register a birth that took place in Massachusetts. 9 P.R. Offic. Trans. at 1089-92.

For her part, Rivera claims that the Supreme Court of Puerto Rico held in Ex Parte Hernández Martínez that for a child to be legitimated, both parents must be listed on the child's birth certificate. The opposite is true; in an opinion that discussed at length the relationship between acknowledgment and legitimation of children, the Puerto Rico Supreme Court explained that under the 1911 Civil Code, natural children

> were entitled to be legitimated by a subsequent marriage . . . . [Section 193 of the 1911 Civil Code] provided that a natural child might be acknowledged by the father and mother jointly or by either of them alone, either in the record of birth, in a will, or in some other public instrument.

65 P.R.R. at 138. In short, the Court held that the subsequent marriage of the parents of a natural child legitimizes the child, whether or not the father appears in the record of birth, as long as the child is acknowledged in a public instrument.

The 1911 Civil Code has been superseded by laws that expand the range of ways in which a parent can acknowledge a child.

<u>Ocasio</u> v. <u>Díaz</u>, 88 P.R.R. 658, 695-98 & n.7 (1963). The Supreme Court of Puerto Rico has held that under current law, "[t]he father, or in his default, his heirs, may acknowledge <u>in any way</u> their children, <u>expressly or impliedly</u>, regardless of the dates or circumstances of their births and <u>for all legal purposes</u>." <u>Id.</u> at 731 (emphasis added). Because Patrick needed only to acknowledge L.N.R. "in any way," his affidavit acknowledging L.N.R. as his daughter sufficed to establish that he is her father. Because Patrick is L.N.R.'s father, his marriage to Rivera legitimated L.N.R.[4]

Rivera also argues that the Supreme Court of Puerto Rico held in <u>Castro Torres</u> v. <u>Negrón Soto</u>, 159 D.P.R. 568 (2003), that the subsequent marriage of a child's parents gives rise only to a presumption of paternity from which the mother's husband can benefit if he is registered as the child's father. This holding is inapposite because Patrick's paternity has been settled in this case: Patrick alleged in his petition that he is the father of L.N.R., Rivera admitted this allegation in her answer, and no one else has challenged Patrick's paternity.

In the alternative, Rivera argues that L.N.R. cannot be legitimated because Puerto Rico's Constitution, as well as one of

---

[4] In her reply brief, Rivera cites a provision of Puerto Rico law that describes the requirements for an affidavit of acknowledgment of paternity. P.R. Laws Ann. tit. 8, § 510. This law is inapplicable here because it merely sets out an expedited administrative procedure for requesting child support.

-13-

its implementing acts, abolished the distinction between legitimate and illegitimate children.  In 1952, Puerto Rico ratified its Constitution, which guarantees that "[n]o discrimination shall be made on account of race, color, sex, <u>birth</u>, social origin or condition, or political or religious ideas."  P.R. Const. art. II, § 1 (emphasis added).  Later that year, Puerto Rico enacted Act No. 17, which provides that "[a]ll children have, with respect to their parents and to the estate left by the latter, the same rights that correspond to legitimate children."  P.R. Laws Ann. tit. 31, § 441.  Interpreting these laws, the Supreme Court of Puerto Rico held that

> [n]o judicial declaration of the status of child shall make any pronouncement as to the legitimacy or illegitimacy of the birth of the petitioner nor as to the civil status of his parents.  The petitioner shall be simply called "child" and his progenitors "father" or "mother," as the case may be.

<u>Ocasio</u>, 88 P.R.R. at 731.  On the basis of this holding, Rivera asks us to conclude that her marriage to Patrick did not legitimate L.N.R. under Puerto Rico law.

Although Puerto Rico has abolished discrimination against children based on the circumstances of their birth, it has not abolished the concept of legitimacy.  Act No. 17's reference to "the same rights that correspond to legitimate children," P.R. Laws Ann. tit. 31, § 441, presupposes that legitimate children still exist in Puerto Rico.  See <u>Ocasio</u>, 88 P.R.R. at 732 ("Any judicial

-14-

declaration of status of child shall acknowledge and decree that the child so declared shall have . . . the same rights that correspond to the legitimate children . . . ."); Perez v. Gardner, 277 F. Supp. 985, 992 (E.D. Wis. 1967) ("[Act No. 17] has been given a much broader application so as expressly to legitimate a bastard for all purposes as between parent and child.").

The concept of legitimation still exists as well. Puerto Rico has never repealed the statute that provides for legitimation of children by the subsequent marriage of their parents, and the statute has been cited since Ocasio was decided, both in federal court and the Supreme Court of Puerto Rico. E.g., Castro Torres, 159 D.P.R. 568, 583 (2003) (certified translation) (citing P.R. Laws Ann. tit. 31, §§ 481-484); Petition for Naturalization of Fraga, 429 F. Supp. 549, 551-52 (D.P.R. 1974) (citing P.R. Laws Ann. tit. 31, § 482); see also Vega ex rel. Morales v. Bowen, 664 F. Supp. 659, 661 (D.P.R. 1987) (citing Ocasio and stating that "the status of legitimacy is to be preferred over that of illegitimacy, and compliance with the legal requirements to establish filiation under the laws of the state of the child's domicile should be enough to legitimate the child. The status of legitimacy . . . should be decided by the courts of her domicile, Puerto Rico." (citation omitted)).

The concepts of legitimacy and legitimation remain important because the laws of jurisdictions other than Puerto Rico

may invoke them. Here, we are interpreting a United Kingdom law that turns on whether Patrick's marriage to Rivera legitimated L.N.R. under Puerto Rico law. In other cases, the legitimacy of a child under Puerto Rico law has determined the child's entitlement to Social Security benefits, Perez, 277 F. Supp. at 991-93, and the child's eligibility for naturalization, Petition for Naturalization of Fraga, 429 F. Supp. at 549-52. To hold that a child can no longer be legitimated under Puerto Rico law, as Rivera asks us to do, would turn the Puerto Rico Constitution and Act No. 17 on their heads. It would discriminate against L.N.R. on the basis of her status at birth--the very result that Puerto Rico law prohibits. Therefore, we hold that Patrick's marriage to Rivera legitimated L.N.R. under Puerto Rico law. As a result, Patrick has "parental responsibility" for L.N.R. under United Kingdom law, which means that he has "rights of custody" under the Hague Convention. The district court erred when it dismissed Patrick's petition on the grounds that he did not have rights of custody.

### C. Bond Requirement

As we mentioned above, the district court ordered Patrick to pay a $10,000 bond, stating that "[t]his bond will serve not only as a non-resident bond, but shall also respond to any damages that Respondent may incur should Petitioner not prevail on the merits." Patrick v. Rivera-Lopez, Civil No. 12–1501 (CVR) (D.P.R. June 25, 2012) (order to show cause). Patrick moved to vacate the

-16-

bond requirement, arguing that the Hague Convention explicitly prohibits a court from requiring such a bond:  "No security, bond or deposit, however described, shall be required to guarantee the payment of costs and expenses in the judicial or administrative proceedings falling within the scope of this Convention."  Hague Convention art. 22.  The district court continued to assert the authority to impose a bond but reduced the amount of the bond to $500.  In a minute order dated June 28, 2012, the district court relied on three opinions that refer to instances in which a court imposed a bond in a Hague Convention case:  Whiting v. Krassner, 391 F.3d 540 (3d Cir. 2004); Bekier v. Bekier, 248 F.3d 1051 (11th Cir. 2001); and Lops v. Lops, 140 F.3d 927 (11th Cir. 1998).

The Hague Convention deprived the district court of authority to impose a bond on Patrick.  We see no distinction between a bond imposed to "respond to damages that Respondent may incur should Petitioner not prevail on the merits" and the bond that the Convention prohibits.  The opinions on which the district court relied refer only in passing to a district court's imposition of a bond, without saying whether ordering the bond was within the court's power.  Whiting, 391 F.3d at 545; Bekier, 248 F.3d at 1053 & n.2; Lops, 140 F.3d at 948, 964.  These opinions offer no reason to ignore the text of the Convention.

### III. Conclusion

For the reasons above, we **<u>reverse</u>** the dismissal of Patrick's petition, **<u>vacate</u>** the order requiring that Patrick post a bond, and **<u>remand</u>** the case to the district court with instructions to conduct a trial as soon as possible.[5]  Mandate shall issue forthwith.

---

[5] Presumably, the trial will address the issues raised in Rivera's answer to Patrick's petition, including her contentions that the United Kingdom was not L.N.R.'s habitual residence, that returning L.N.R. to the United Kingdom would expose her to a grave risk of harm, and that Patrick consented to L.N.R.'s return to the United States.